**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

QWEST CORPORATION, a Colorado
corporation,

     Plaintiff - Appellant,

v.

THE PUBLIC UTILITIES
COMMISSION OF THE STATE OF
COLORADO, a regulatory agency of
the State of Colorado; GREGORY E.
SOPKIN, POLLY PAGE, and CARL
MILLER, in their official capacities as
Commissioners of the Public Utilities
Commission of Colorado,

     Defendants - Appellees.

----------------

VERIZON,

     Amicus Curiae.

No. 06-1132

---

QWEST CORPORATION, a Colorado
corporation,

     Plaintiff - Appellant,

v.

PUBLIC SERVICE COMMISSION
OF UTAH, a regulatory agency of the

No. 06-4021

State of Utah; RICHARD M. CAMPBELL; CONSTANCE B. WHITE; TED BOYER, in their official capacities as Commissioners of the Public Service Commission of Utah,

      Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICTS OF COLORADO AND UTAH
(D.C. No. 04-CV-2596-WYD-MJW)
(D.C. No. 04-CV-1136-TC)**

---

John M. Devaney, Perkins, Coie, L.L.P., Washington, D.C., for Plaintiff - Appellant.

Mark T. Valentine, (John Suthers, Colorado Attorney General and Paul C. Gomez, First Assistant Attorney General, State Services Section, on the brief), Denver, Colorado, for Defendants - Appellees Public Utilities Commission of Colorado.

Scott H. Angstreich, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C. (and Gregory M. Romano, General Counsel - Northwest Region, Everett, Washington, on the brief), for Amicus Curiae Verizon.

Sandy J. Mooy, Attorney for Public Service Commission and Individual Commissioners, Salt Lake City, Utah, for Defendants - Appellees Public Service Commission of Utah.

---

Before **KELLY**, **ALARCÓN**,[*] and **LUCERO**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

[*] The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

In these consolidated appeals, Plaintiff-Appellant Qwest Corporation asks us to determine whether it was obligated to seek state utility commission approval of a contract in which it agreed to provide MCImetro Access Transmission Services, LLC ("MCImetro"), with access to a service known as Qwest Platform Plus™. The Public Utility Commission of Colorado and the Public Service Commission of Utah both independently determined that the Telecommunications Act of 1996 ("the Act")–specifically, 47 U.S.C. § 252(a)(1)–required Qwest and MCImetro to submit their agreement for approval, and the district courts in Colorado and Utah agreed. Qwest challenges this conclusion, asserting that the filing obligation in § 252 arises only if an agreement contains network elements that Qwest must make available to other carriers pursuant to 47 U.S.C. § 251. Our jurisdiction to review the district courts' final orders arises under 28 U.S.C. § 1291, and we affirm.

Background

Through a merger, Qwest obtained U.S. West, a former subsidiary of AT&T which was divested pursuant to a consent decree between AT&T and the United States government. Under current parlance, Qwest is known as a Bell operating company ("BOC," meaning a former AT&T subsidiary) and an incumbent local exchange carrier ("ILEC," meaning a local telephone service

- 3 -

provider that used to have a monopoly in a certain area) in both Colorado and

Utah. As such, the Telecommunications Act of 1996 requires Qwest to share its

network resources with other telecommunications carriers ("competitive local

exchange carriers" or "CLECs"), that wish to enter Qwest's local markets.

MCImetro is a CLEC in Utah and Colorado.

I.      Statutory Framework: The Telecommunications Act of 1996

For most of its history, "local phone service was thought to be a natural

monopoly." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999).

Accordingly, states alone regulated the industry, seeking to ensure that each local

monopolist provided adequate service at reasonable prices.[1] This regime began to

change in 1982, when AT&T agreed to divest itself of the local exchange carriers

that it owned. See United States v. AT&T, 552 F. Supp. 131 (D.D.C. 1982), aff'd

sub nom. Maryland v. United States, 460 U.S. 1001 (1983). Fourteen years later,

"Congress enacted the Telecommunications Act of 1996, which fundamentally

changed telecommunications regulation by introducing competition in the local

service market." Sw. Bell Tel. Co. v. Apple, 309 F.3d 713, 715 (10th Cir. 2002)

(internal quotation marks omitted). In passing the legislation, Congress hoped to

---

[1] "States typically granted an exclusive franchise in each local service area
to a local exchange carrier (LEC), which owned, among other things, the local
loops (wires connecting telephones to switches), the switches (equipment
directing calls to their destinations), and the transport trunks (wires carrying calls
between switches) that constitute a local exchange network." Id.

- 4 -

obtain the benefits of competition for the American consumer while avoiding, as much as possible, the potential that established entities would use their existing market power to prey on would-be market entrants. See Thomas G. Krattenmaker, The Telecommunications Act of 1996, 29 Conn. L. Rev. 123, 129-31 (1996).

Therefore, "incumbent LECs are subject to a host of duties intended to facilitate market entry." Iowa Utils. Bd., 525 U.S. at 371. These duties "essentially require the incumbents to interconnect with and to rent parts of their networks to new entrants–especially those parts of a local network that it is least economic for a new entrant to duplicate." James B. Speta, Antitrust and Local Competition Under the Telecommunications Act, 71 Antitrust L.J. 99, 102-03 (2003). At the same time, the Act provides for targeted monitoring of these interconnections by state and federal regulators. See 47 U.S.C. § 252(e).

In this case, three provisions of the Act are at issue. The first is § 251, which–among other things–imposes a duty on ILECs to "interconnect" with would-be competitors. See 47 U.S.C. § 251(a)(1). The second is § 252, which provides that an ILEC faced with a request for interconnection may either negotiate an agreement with the requesting party or submit to arbitration by a state regulatory agency; in either case, the resulting "interconnection agreement" must be submitted to the state regulatory agency for approval. Id. § 252(a)-(b), (e). The third provision at issue is § 271, which allows BOCs to provide long-

distance telephone service to their customers as long as they comply with certain conditions enumerated in the statute. Id. § 271(a). The dispute in this case is whether the agreements between Qwest and MCImetro are "interconnection agreements" that must be approved by state regulatory bodies pursuant to § 252, whether they are simply agreements wherein Qwest agrees to provide the services enumerated in § 271, or whether they are both.

A.    Section 251: The Duties Imposed on Telecommunications Carriers

"Section 251 of the Act establishes a three-tier system of obligations imposed on separate, statutorily defined telecommunications entities." Atlas Tel. Co. v. Okla. Corp. Comm'n, 400 F.3d 1256, 1262 (10th Cir. 2005). Under the first tier, all carriers have the duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). In the second tier, all local exchange carriers (both ILECs and CLECs) have the duty to resell telecommunications services without "unreasonable or discriminatory conditions or limitations . . . ." Id. § 251(b)(1). They are also obligated to provide number portability, dialing parity, access to rights of way, and reciprocal compensation. Id. § 251(b)(2)-(5). Finally, the third tier contains the "[f]oremost among these duties[:] . . . the [ILEC's] obligation . . . to share its network with competitors." Iowa Utils. Bd., 525 U.S. at 371; see 47 U.S.C. § 251(c).

The statute establishes three methods of providing access to an ILEC's

- 6 -

local network.  See MCI Telecomm. Corp. v. Bell Atl.-Pa., 271 F.3d 491, 498 (3d Cir. 2001).  First, a CLEC "may build its own network and interconnect with the [ILEC's] network."  Id. (internal quotation marks omitted).[2]  Second, a CLEC "may lease individual elements of the existing network on an 'unbundled basis' at 'any technically feasible point' on 'rates, terms, and conditions that are just, reasonable, and nondiscriminatory.'"  Id. at 499 (quoting 47 U.S.C. § 251(c)(3)).  Finally, a CLEC may purchase at wholesale prices the entire package of services provided by the ILEC and simply resell them to customers.  Id.; see also 47 U.S.C. § 251(c)(4)(A).

Each of these options benefits the CLEC because "[t]he firm need not build that which the incumbent LEC has already built; the entrant may just plug into it, at prices deemed fair by the FCC."  Krattenmaker, supra, at 139.  The requirement that ILECs share their networks is an integral part of the new regulatory scheme because "[w]ithout [it], a new carrier's entry barriers would be insurmountable."  Speta, supra, at 118.

B.      Section 252: The Filing Obligation

"Section 252 . . . specifically describes how § 251's obligations are to be implemented . . . ."  Iowa Utils. Bd., 525 U.S. at 419 (Breyer, J., concurring in

_____

[2]  The statute requires ILECs to "provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network . . . for the transmission and routing of telephone exchange service and exchange access."  47 U.S.C. § 251(c)(2).

- 7 -

part and dissenting in part). First, it permits carriers to negotiate interconnection agreements on their own initiative:

> Upon receiving a request for interconnection . . . services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. . . . The agreement . . . shall be submitted to the State commission under subsection (e) of this section.

47 U.S.C. § 252(a)(1). This subsection allows the ILEC "to negotiate and enter into a binding agreement with the new entrant to fulfill the duties imposed by §§ 251(b) and (c) . . . ." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 638-39 (2002) (internal quotation marks omitted). However, the "without regard" clause indicates that "the parties may make agreements that go beyond or contradict the specific statutory requirements that an incumbent must follow." Speta, supra, at 119.

After prescribing the procedure by which a CLEC may seek compulsory arbitration by the state commission, the statute requires that all interconnection agreements–those reached by negotiation and those reached by arbitration–be submitted to the state agency for approval:

> Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

47 U.S.C. § 252(e)(1). The statute offers only two permissible grounds for

rejecting a negotiated agreement: (1) the agreement discriminates against a non-party telecommunications carrier, or (2) the implementation of the agreement is inconsistent with the public interest. Id. § 252(e)(2). Section 252(e)(6) permits a party aggrieved by the action of a state commission to appeal the decision to the district court, which must then determine "whether the agreement or statement [submitted for approval] meets the requirements of section 251 of this title and this section."

C.      Section 271: The Competitive Checklist and InterLATA Service

Section 271 allows an ILEC carrier to provide long-distance service ("interLATA services")[3] in its local market if that market is sufficiently competitive. The ILEC may only provide in-region interLATA services if: (A) "it has entered into one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the [ILEC] is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service . . . to residential and business subscribers;" or (B) no CLEC has requested access and interconnection. 47 U.S.C. § 271(c)(1)(A)-(B). Thus,

---

[3] "All former Bell System territory has been divided into Local Access and Transport Areas, or 'LATAs.' InterLATA service refers to what consumers know as long-distance service; intraLATA to what they know as local service (although some intraLATA calls may be 'toll' calls, depending upon classifications made by the state regulatory bodies)." SBC Commc'ns, Inc. v. F.C.C., 138 F.3d 410, 412 n.1 (D.C. Cir. 1998) (internal citation omitted).

the first condition "visualizes a demonstration of a competitor in the local exchange market," while the second is a "default" to prevent an ILEC from being penalized simply because no competitor wishes to enter its market. SBC Commc'ns, Inc. v. F.C.C., 138 F.3d 410, 413-14 (D.C. Cir. 1998).

If the ILEC is operating in a competitive market and wishes to qualify under § 271(c)(1)(A), it must meet the requirements of § 251 as well as the additional requirements of the "competitive checklist" in § 271(c)(2)(B): "[n]ondiscriminatory access to the poles, ducts, conduits, and rights-of-way owned or controlled by the [incumbent LEC] at just and reasonable rates;" unbundled local loop transmission; unbundled "local transport from the trunk side of a wireline local exchange carrier switch;" "local switching unbundled from transport, local loop transmission, or other services;" and nondiscriminatory access to other network resources (e.g., 911 and E911 services). 47 U.S.C. § 271(c)(2)(B)(ii)-(vii). "Most of these conditions relate to the interconnection obligations . . . that other provisions of that Act impose on each incumbent LEC. . . . In short, the BOCs' ability to offer long distance services and to manufacture equipment is conditioned on their meeting their new open interconnection responsibilities." Krattenmaker, supra, at 141-42.

II.    Regulatory Background: The FCC's Interpretation of the Act

In 2002, Qwest petitioned the FCC for a declaratory ruling "about the types of negotiated contractual arrangements between incumbent local exchange

- 10 -

carriers (LECs) and competitive LECs that should be subject to the filing requirements of [§ 252(a)(1)]." In re Qwest Commc'ns Int'l, Inc., 17 F.C.C.R. 19337, 19337 (2002). Qwest argued that "the following categories of arrangements should not be subject to [the filing requirement in] section 252(a)(1): . . . agreements regarding matters not subject to sections 251 or 252 (e.g., . . . network elements that have been removed from the list of elements subject to mandatory unbundling)." Qwest Corp. v. Pub. Serv. Comm'n of Utah, No. 2:04-CV-1136 TC, 2005 WL 3534301, at *5 (D. Utah Dec. 21, 2005) (quoting Qwest's Petition Br.).

The FCC rejected this approach, advising that:

[A]n agreement that creates an ongoing obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1). . . . [W]e do not believe that section 252(a)(1) can be given the cramped reading that Qwest proposes. Indeed, on its face, section 252(a)(1) does not further limit the types of agreements that carriers must submit to state commissions.

In re Qwest, 17 F.C.C.R. at 19341. However, the FCC also disagreed with commentators who had urged that § 252 requires "the filing of all agreements between an incumbent LEC and a requesting carrier." Id. at 19341 n.26. Instead, it ruled that "only those agreements that contain an ongoing obligation relating to section 251(b) or (c) must be filed under 252(a)(1)." Id. Although it held that agreements need not be filed if they "simply provide for 'backward-looking

- 11 -

consideration,'" the FCC otherwise "decline[d] to address all the possible hypothetical situations presented in the record before [it]." Id. at 19342. Rather, the FCC emphasized "that the state commissions should be responsible for applying, in the first instance, the statutory interpretation we set forth today to the terms and conditions of specific agreements." Id. at 19340.

III.    Procedural Background

Shortly after the passage of the Telecommunications Act, Qwest and MCImetro entered into negotiations and reached an interconnection agreement governing their relations in fourteen states, including Colorado and Utah. Pursuant to 47 U.S.C. § 252, the carriers filed their agreement with the state commissions in Utah and Colorado, which approved it. Then, in early 2004, Qwest and MCImetro culminated additional negotiations and reached two new agreements, which MCImetro filed with both state commissions. The first was an amendment to the earlier interconnection agreement, and the second was the "Qwest Master Services Agreement" ("QPP Agreement") at issue in this case.[4]

Under the QPP Agreement, Qwest contracted to provide MCImetro with a service referred to as Qwest Platform Plus™, which is comprised of two network elements: switching and shared transport. Prior regulations required ILECs like Qwest to provide these network elements pursuant to the duties imposed by

_____

[4] Both commissions approved the amendment to the original interconnection agreement, and that action is not challenged here.

- 12 -

§ 251(c)(3), but the FCC's Triennial Review Remand Order determined that switching and shared transport were no longer required elements in most instances. See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers (TRRO), 18 F.C.C.R. 16978, 16989 (2003), vacated in part, U.S. Telecom Ass'n v. F.C.C., 359 F.3d 554 (D.C. Cir. 2004). Accordingly, Qwest may refuse to provide these elements to CLECs without violating its obligations under § 251. However, 47 U.S.C. § 271 requires Qwest to provide switching and shared transport if it wishes to offer long-distance service to its local customers, and Qwest asserts that the sole purpose of the QPP Agreement was to satisfy this § 271 obligation.

In July 2004, MCImetro petitioned both state commissions seeking approval of the QPP Agreement. Qwest timely moved to dismiss MCImetro's petitions, arguing that the commissions lacked the authority to approve the QPP Agreement because it was not an "interconnection agreement" under 47 U.S.C. § 252. Specifically, Qwest contended that it was not required to provide QPP services by 47 U.S.C. § 251(b) or (c) and that the state commissions only had authority to review agreements for services enumerated in those subsections. Both commissions disagreed, denying Qwest's motions to dismiss and approving the QPP Agreement.[5]

---

[5] Aside from denying Qwest's motion to dismiss, the Utah Public Service Commission took no action with respect to MCImetro's petition for approval.

Qwest then filed actions against both commissions in the appropriate district courts seeking declaratory and injunctive relief. It argued again that only agreements containing obligations enumerated in § 251(b) and (c) are subject to the filing requirement in § 252. The courts rejected Qwest's arguments, and the commissions' orders were affirmed. Now, Qwest appeals both district court rulings. The two cases were consolidated for oral argument, and we decide them both in this opinion.

## Discussion

### I. Jurisdiction and Standing

Before reaching the merits of this case, we have an "independent duty" to ensure that the district courts properly asserted jurisdiction over Qwest's lawsuits. See Phelps v. Hamilton, 122 F.3d 1309, 1315-16 (10th Cir. 1997). Qwest sought both a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, and an injunction, invoking the district court's jurisdiction under 28 U.S.C. § 1331 as well as 47 U.S.C. § 252(e)(6). Although § 252(e)(6) by its own terms confers jurisdiction only "to determine whether the agreement or statement meets the requirements of section 251 of this title and this section," the Supreme Court has held that this statement "does not divest the district courts of their authority under

When a state commission fails to take action on a petition for approval within ninety days, the agreement is deemed approved. See 47 U.S.C. § 252(e)(4).

- 14 -

28 U.S.C. § 1331 to review [a] Commission's order for compliance with federal law." Verizon Md., 535 U.S. at 642. The Court has also held that the district courts' federal question jurisdiction extends to lawsuits seeking declaratory and injunctive relief against a state commission even though the challenged action was neither the approval nor the rejection of a filed agreement. Id. at 642-43. Accordingly, we have recognized that § 252(e)(6) "grants federal courts jurisdiction in 'any case' in which a state commission makes a 'determination' under this section." Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc., 235 F.3d 493, 497 (10th Cir. 2000). We conclude that the district courts properly asserted jurisdiction.

We are likewise obliged to satisfy ourselves that Qwest had standing to invoke the district courts' jurisdiction. DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006). Article III of the Constitution bars the federal courts from issuing advisory opinions; accordingly, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). Here, the injury-in-fact asserted by Qwest is an obligation (which it contends does not apply) to file under § 252, which could force Qwest to provide switching and shared transport services (no longer required under § 251(c)(3)) to other CLECs on the same terms that it reached with MCImetro. See 47 U.S.C. § 252(i); In re Qwest Corp., 19 F.C.C.R. 5169, 5180 (2004); Aplt. Supp. Br. on Juris. Issues at

- 15 -

5-6. This claimed injury could be redressed if we determined that the Utah and Colorado commissions were in error in requiring Qwest to file the QPP Agreement; if we vacated the commissions' orders, § 251(i) would be rendered inapplicable and no CLEC could force Qwest to accept the same terms it agreed upon with MCImetro. Accordingly, we conclude that Qwest has standing, and we proceed to consider Qwest's appeals on the merits.

II.     Is the QPP Agreement an Interconnection Agreement Subject to Filing?

The question presented in these appeals is whether the QPP Agreement is an interconnection agreement that must be filed pursuant to § 252 of the Telecommunications Act of 1996. We apply "a de novo standard when reviewing state commissions' interpretations of the Act . . . , as those decisions turn on determinations of federal law." Sw. Bell, 309 F.3d at 717; see also Atlas Tel. Co., 400 F.3d at 1260.

Our own statutory interpretation begins with the plain language of the Act. United States v. Saenz-Gomez, 472 F.3d 791, 793 (10th Cir. 2007). We "construe the words of the statute in their ordinary sense . . . giv[ing] effect, if possible, to every word of the statute." Quarles v. U.S. ex rel. Bureau of Indian Affairs, 372 F.3d 1169, 1172 (10th Cir. 2004). However, given that "[i]t would be a gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction," Iowa Utils. Bd., 525 U.S. at 397, we must defer to reasonable FCC interpretations of

- 16 -

the Act where they are applicable, see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

The parties agree that a contract must be filed as an interconnection agreement if it "contain[s] an ongoing obligation relating to section 251(b) or (c) . . . ." In re Qwest, 17 F.C.C.R. at 19341 n.26.[6] Section 251(c) imposes "[t]he duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network . . . ." 47 U.S.C. § 251(c)(2). "Interconnection" is defined as "the physical linking of two networks for the mutual exchange of traffic." In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996 (First Local Competition Order), 11 F.C.C.R. 15499, 15514 (1996), vacated in part, People of the State of Cal. v. F.C.C., 124 F.3d 934 (8th Cir. 1997), rev'd in part sub nom. AT&T Corp. v. Iowa Utils. Bd. 525 U.S. 366 (1999).[7] Therefore,

_____

[6] The parties have not contested the validity of this FCC interpretation, nor could they. See 28 U.S.C. § 2342. Indeed, Qwest asserts that the FCC's interpretation of 47 U.S.C. § 252 in its Declaratory Order is "entirely consistent with the plain language and structure of the Act." Qwest Utah Br. at 50.

[7] Neither the Eighth Circuit nor the Supreme Court undermined the Commission's definition of "interconnection," and it has continued to rely on that definition in its adjudications. See, e.g., In re Verizon New England, Inc., 17 F.C.C.R. 7625, 7740-41 (2002); In re Total Telecomms. Servs., Inc., 16 F.C.C.R. 5726, 5736 (2001) ("We have previously held that the term 'interconnection' refers solely to the physical linking of two networks, and not to the exchange of traffic between networks."). Furthermore, the D.C. Circuit has accepted this definition as a reasonable interpretation of the Act. AT&T Corp. v. F.C.C., 317 F.3d 227, 235 (D.C. Cir. 2003); see also Brooks Fiber, 235 F.3d at 494 ("The terms under which the networks are connected are contained in 'interconnection

- 17 -

we must affirm if the QPP Agreement contains ongoing obligations related to the physical linking of two networks.

Alternatively, we must affirm if we conclude that the QPP Agreement contains an ongoing obligation relating to unbundled network elements. Section 251(c) imposes the duty "to provide . . . nondiscriminatory access to network elements on an unbundled basis at any technically feasible point," 47 U.S.C. § 251(c)(3), if "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer," id. § 251(d)(2)(B). Congress has provided that "[t]he term 'network element' means a facility or equipment used in the provision of telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment . . . ." Id. § 153(29). Accordingly, the QPP Agreement was subject to filing under § 252 if it contains an ongoing obligation relating to a facility or equipment used in the provision of telecommunications service.

A.    Switching

Switches are "equipment directing calls to their destination." Iowa Utils. Bd., 525 U.S. at 371. Although the FCC has not given a simple and authoritative definition of the term "switching," its discussion of the term in the TRRO makes

---

agreements.'"). Qwest has not challenged its validity here.

very clear that switching relates to the physical linking of two networks. The FCC began by noting "that an important function of the local circuit switch is as a means of accessing the local loop." TRRO, 18 F.C.C.R. at 17244 ¶ 429. Moreover, "one of the most essential functions a switch performs is to provide routing information that sends a call to the appropriate destination." Id. at 17246 ¶ 434. The FCC explained that CLECs must either gain access to the ILEC's switches or create physical connections between their own switches and the ILEC's loop in order to provide local service. Id. at 17244 ¶ 429. Additionally, switching "performs several specific functions, including connecting loop facilities to the network, switching loops to other lines and trunks, and providing service capabilities to customers, such as dial tone and vertical features." Id. at ¶ 430. The Commission has defined switching "to encompass line-side and trunk-side facilities, plus the features, functions, and capabilities of the switch . . . includ[ing] the basic switching function of connecting lines to lines, lines to trunks, trunks to lines, and trunks to trunks." Id. at 17245-46 ¶ 433 (internal citations omitted).

In the TRRO, the FCC determined that ILECs were not required to provide switching as an unbundled network element pursuant to § 251(c)(3) because the failure to provide access to switching would not impair a CLEC's ability to provide local telephone service to its customers. See TRRO, 18 F.C.C.R. at 16989; 47 U.S.C. § 251(d)(2)(B). However, the conclusion that § 251(c)(3) does

not require ILECs to provide switching says nothing about whether switching is related to the obligation to interconnect found in § 251(c)(2). Insofar as the FCC has described "the basic switching function of connecting lines to lines, lines to trunks, trunks to lines, and trunks to trunks," TRRO, 18 F.C.C.R. at 17246 ¶ 433, switching is unmistakably related to the physical connection of two networks. See also MCI, 271 F.3d at 502 (characterizing remote switching modules–instruments that contain multiple switches–as "devices used for interconnection"). Accordingly, we conclude that agreements–such as the QPP Agreement–that permit ongoing access to an ILEC's switches are interconnection agreements that must be filed under 47 U.S.C. § 252.

Furthermore, the switching service in the QPP Agreement is related to the provision of unbundled network elements under § 251(c)(3). Qwest does not dispute that switching is a network element, see Qwest Utah Br. at 69, and the QPP Agreement gives MCImetro ongoing access to switching on an unbundled basis. Although the FCC has concluded that a lack of access to switching would not impair MCImetro's ability to provide services within the meaning of § 251(d)(2)(B), the FCC has also determined that access to switching generally facilitates a CLEC's ability to provide services, especially in the mass market. TRRO, 18 F.C.C.R. at 17249-55 ¶¶ 438-47. Thus, while access to switching is not required by § 251(c)(3), it is related to Qwest's § 251(c)(3) obligations because it will assist MCImetro in providing services. As a result, § 252 required

- 20 -

Qwest and MCImetro to file the QPP Agreement with the state commissions.

B.     Shared Transport

Transport trunks are "wires carrying calls between switches." Iowa Utils. Bd., 525 U.S. at 371. The FCC has defined shared transport as "transmission facilities shared by more than one carrier, including the incumbent LEC, between end office switches, between end office switches and tandem switches, and between tandem switches in the incumbent LEC's network." TRRO, 18 F.C.C.R. at 17319 ¶ 533; see also U.S. Telecom Ass'n v. F.C.C., 359 F.3d 554, 588 (D.C. Cir. 2004).[8] It has also noted that "switching and shared transport are inextricably linked," such that a CLEC must be given access to unbundled shared transport if it is entitled to unbundled switching under 47 U.S.C. § 251(c)(3). TRRO, 18 F.C.C.R. at 17319-20 ¶ 534.

In light of this understanding of shared transport, we conclude that shared transport relates to the physical linking of two networks. Indeed, calls must often

_____

[8]  According to the QPP Agreement:

Qwest will provide Shared Transport to carry originating access traffic from, and terminating to, MCI QPP™ End User Customers. MCI traffic will be carried on the same transmission facilities between End Office Switches, between End Office Switches and Tandem Switches, and between Tandem Switches in its network facilities that Qwest uses for its own traffic.

Qwest Utah Br. Attach. 3 (QPP Agreement) ¶ 1.5.2. This clearly envisions a linking of MCImetro's network and Qwest's network.

pass through a switch, travel across a shared transport trunk, and then pass through another switch in order to cross from one network to another. In this way, switching and shared transport are "inextricably linked" and both relate to the physical connection of two networks.

Likewise, shared transport relates to Qwest's obligation to provide unbundled network elements. Shared transport is a network element that Qwest is providing on an unbundled basis. The FCC has determined that a lack of access to shared transport impairs a CLEC's ability to provide services to the extent that a lack of access to switching impairs the CLEC's ability to provide services. Id. As with switching, access to shared transport facilitates the CLEC's provision of services to its customers. It is therefore related to the ILEC's § 251(c)(3) duty to provide access to unbundled network elements whose absence would impair the CLEC's ability to provide services.

III. Qwest's Contrary Arguments

Qwest valiantly attempts to persuade us to adopt a very narrow reading of the Act and the FCC's precedents. It conveniently ignores the word "relating" in the FCC's interpretation of the Act, asserting that "[i]f an agreement does not involve these Section 251 [(b) and (c)] duties, the Section 252 process cannot be triggered and the agreement, as a matter of law, cannot be an 'interconnection agreement' subject to the Section 252 filing requirement." Qwest Utah Br. at 39-40 (emphasis added). In support of this reading, Qwest advances four main

arguments, all of which we find unpersuasive.[9]

A.    Section 252's "Pursuant to Section 251" Clause

First, Qwest argues that the introductory clause of § 252(a) excludes the QPP Agreement from the filing requirement. According to § 252(a), "[u]pon receiving a request for interconnection, services, or network elements pursuant to section 251," an ILEC may negotiate an interconnection agreement, which must be submitted to the state commission. Qwest argues that "pursuant to 251" means that the CLEC must have requested access to an element that the ILEC has a duty to provide under § 251(c) and that the ultimate agreement must "implement [a] Section 251 requirement." Qwest Utah Br. at 46-47.

In support of this position, Qwest points to a recent federal district court decision from Montana. Qwest Corp. v. Schneider, No. CV-04-053-H-CSO, 2005 U.S. Dist. LEXIS 17110 (D. Mont. June 5, 2005). In Schneider, Qwest appealed from a decision by the Montana Public Service Commission that asserted jurisdiction over a line sharing agreement between Qwest and Covad. Id. at *1-2. The parties in Schneider–like the parties in this case–agreed that the agreement was for access to an element that was not a required unbundled network element under § 251(c)(3). See id. at *14. Thus, the court was confronted with the legal

_____

[9] Qwest has also made innumerable ancillary arguments–which we have considered and necessarily rejected given our resolution of the main questions–in the 235 pages of briefing that it has submitted in this case.

question of whether § 252's filing obligation could apply to elements that were not required by § 251.  In holding that the agreement was not subject to filing under § 252, the court interpreted "pursuant to section 251" to limit the filing obligation to "those agreements that contain section 251 obligations."  Id. at *20 (emphasis added).  It also held that its interpretation was consistent with the language "ongoing obligation relating to section 251(b) or (c)" in the FCC's Declaratory Order.  See id. at *21.

Qwest argues that the state commissions reached the opposite result after considering that exchange carriers who receive requests pursuant to section 251 may negotiate agreements "without regard to the standards set forth in subsections (b) and (c) of section 251."  47 U.S.C. § 252(a)(1).  Qwest asserts that the commissions believed that this phrase freed their approval authority from the specific provisions of those subsections, and it urges us to interpret the phrase as permitting the parties to reach terms not required by § 251 (for example, a different pricing method) but only with respect to the network elements included in § 251(c)(3).  An alternative understanding of the statute, Qwest contends, leaves "no practical limit on the agreements over which state commissions would have jurisdiction."  Qwest Utah Br. at 47.

However, Qwest's reading of the "without regard" clause does not confirm its interpretation of "pursuant to" in § 252(a).  The plain language of § 252 directs that when an ILEC has received a request for network access as described

in § 251(b) and (c)–resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled access, or collocation–it may negotiate an agreement for one or more of these means of network access. See 47 U.S.C. § 252(a)(1). The statute does not say that the agreement may only provide what is described in § 251(b) and (c). Instead, it must be given a broader reading that is consistent with the FCC's understanding of "interconnection, services, or network elements."[10] Id. § 252(a). The most logical reading of the statute is that the filing obligation in § 252 covers agreements reached following a request for interconnection–that is, "the physical linking of two networks," First Local Competition Order, 11 F.C.C.R. at 15514–or network elements–that is, "facilit[ies] or equipment used in the provision of telecommunications service," 47 U.S.C. § 153(29)[11]–or services. Qwest's reading is too narrow, both because it would exclude an agreement that contained an "ongoing obligation relating to section 251(b) or (c)" if it did not specifically include a required element under those subsections and because it would exclude an agreement that contained a required element but was initiated

---

[10] After all, the statute terms the resulting agreements "interconnection agreements."

[11] Qwest suggests that this definition "is so broad that it is difficult to conceive of anything in a telecommunications network that does not fall within its terms." Qwest Utah Br. at 69. We believe, however, that the breadth of the definition shows Congress's desire to subject a broad range of agreements to the filing requirement.

by a request for a non-required element.[12]

It is notable that Congress chose three terms with broad meanings–
"interconnection, services or network elements"–rather than the more specific and
narrow language it used in § 251. Qwest argues that Congress used the term
"network elements" when it meant "unbundled network elements" as that term is
used in § 251. Adopting this interpretation would require us to ignore the word
"unbundled" in contravention of the "familiar principle of statutory construction
that courts should give effect, if possible, to every word that Congress has used in
a statute." Conn. Dep't of Income Maintenance v. Heckler, 471 U.S. 524, 530
n.15 (1985). This we refuse to do.

Sections 251 and 252 were designed to address different concerns, and
Congress prescribed different criteria by which to judge compliance with the
obligations they impose. While the mandatory provision of a network element
under § 251(c)(3) is triggered by a finding that a lack of access "impairs" a
CLEC's ability to provide services, see 47 U.S.C. § 251(d)(2)(B), a state

---

[12] Imagine that Qwest's interpretation is correct. In this case, MCImetro
initiated the negotiations with a request for switching and shared transport, which
are not required unbundled network elements under § 251(c)(3). If Qwest had
offered to include collocation in the agreement, as well, the agreement would not
be subject to the filing requirement even though collocation is covered by
§ 251(c)(6) because the initiating request was not made "pursuant to section 251."
This odd result suggests that Qwest's interpretation is not correct. See Clinton v.
City of New York, 524 U.S. 417, 429 (1998) (refusing to adopt a statutory
reading that "would produce an absurd and unjust result which Congress could
not have intended.").

commission can only reject a voluntarily negotiated agreement if it finds that the agreement is discriminatory or inconsistent with the public interest, see id. § 252(e)(2)(A)(i)-(ii). Thus, § 251 obligations reflect Congress's concern for the interests of the requesting carrier, whereas the § 252 filing requirement is driven by concerns for the public interest and the interests of other non-party carriers. Congress sensibly recognized that the class of network elements whose non-provision would impair a CLEC's ability to enter the market is substantially narrower than the class of network elements whose provision on favorable terms could discriminate or impact the public interest. Accordingly, we conclude that Congress used "unbundled network elements" in § 251(c)(3) and "network elements" in § 252(a) because it intended to convey different meanings in those two sections.

It is also significant for the purposes of this case that switching and shared transport are undoubtedly "network elements,"[13] although they are not included in the category of network elements that must be offered on an unbundled basis pursuant to § 251(c)(3) and § 251(d)(2). Switching and shared transport do not qualify as unbundled network elements under § 251(c)(3), but we need not look to § 251(c)(3) for a definition of "network element" because Congress defined the term in § 153(29). The TRRO leaves no doubt that the FCC considers switching

---

[13] Indeed, Qwest admits as much. See Qwest Utah Br. at 69.

and shared transport to be network elements, and that understanding is entirely consistent with the definition given in § 153(29).

Therefore, we are not persuaded by Qwest's argument that the QPP Agreement was not subject to filing under § 252 because it was not negotiated following a request made "pursuant to section 251." Qwest does not challenge the FCC's determination that agreements must be filed if they contain an "ongoing obligation relating to section 251(b) or (c)," and the Commission's use of the word "relating" is entirely consistent with Congress's use of terms that are similar to, but broader than, those found in § 251. Schneider's holding that agreements containing an "ongoing obligation relating to section 251(b) or (c)" are "those agreements that contain section 251 obligations" is entirely untenable. See Schneider, 2005 U.S. Dist. LEXIS at *20-21 (emphasis added). The "practical limit" that Qwest seeks comes not from the "pursuant to" clause but from the FCC's use of the word "relating." Thus, not all agreements between carriers must be filed; rather, only those containing an "ongoing obligation relating to section 251(b) or (c)" are subject to § 252's filing requirement.

B.    The Arbitration Element of Section 252

Qwest next contends that the range of negotiated agreements subject to filing is coextensive with the range of arbitrated agreements that must be filed pursuant to § 252. Because a CLEC may only compel arbitration of issues that the ILEC is under a duty to negotiate pursuant to § 251(c)(1), the

"interconnection agreements" that result from arbitration necessarily include only the issues mandated by § 251(b) and (c).  See, e.g., MCI Telecomms. Corp. v. BellSouth Telecomms., Inc., 298 F.3d 1269, 1274 (11th Cir. 2002).  Qwest argues that it would be strange to interpret "interconnection agreement" to cover a broader spectrum of issues when the agreement is generated by negotiation than when it is created by arbitration.

We disagree.  It makes perfect sense that the commission may only compel an ILEC to arbitrate with respect to services that it is under a duty to provide.  Arbitration is an option specifically designed to address situations where an ILEC is under a duty to provide a service but cannot reach an agreement with a CLEC; deadlock would violate the ILEC's statutory duty to provide the element, but allowing no alternative would permit the CLEC to force the ILEC to accept unfavorable terms in order to avoid violating its duty.  When negotiations fail, arbitration must be broad enough to allow the ILEC to fulfill its statutory obligation.  However, the state commissions cannot create a duty to provide services not required by the statute, so their arbitration power cannot extend beyond the four corners of § 251.

Negotiation, on the other hand, has no such constraints.  A negotiated agreement may cover any number of issues, some required by § 251 and others not.  Negotiated agreements may include more issues than arbitrated agreements, but both can still be considered "interconnection agreements" under § 252.

- 29 -

Nothing in the statute suggests that the term "interconnection agreement" covers a field precisely as broad as the arbitration option and no more so. The fact that arbitrated agreements are confined to § 251 duties in no way limits the scope of negotiated agreements that are subject to filing under § 252.

C.    The Limited Scope of Permissible Judicial Review

Pursuant to § 252(e)(6), federal courts are empowered to review determinations by state commissions concerning interconnection agreements to ensure that "the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). Qwest argues that "[i]f Congress had intended to give state commissions the authority to review and approve agreements that do not contain the duties listed in Section 251, it would not have limited judicial review in this manner." Qwest Utah Br. at 42. The Supreme Court has made clear, however, that district courts have broad federal question jurisdiction to review determinations made by state commissions, including decisions made wholly independent of § 251. Verizon Md., 535 U.S. at 642. Furthermore, the FCC has ruled that state commissions have approval authority over any agreement that contains ongoing obligations relating to § 251 duties. Thus, even if Qwest is correct that Congress intended the scope of judicial review to be coextensive with the scope of the state commissions' authority over interconnection agreements, it is clear that the federal courts are empowered to review a decision under § 252 that an agreement contains ongoing

- 30 -

obligations related to § 251 duties.

D.     Section 271

Finally, Qwest urges us to rely on the QPP Agreement's self-characterization as an effort to fulfill Qwest's obligations under 47 U.S.C. § 271. Of course, we determine de novo–without regard to the parties' stated intent–whether the QPP Agreement is an interconnection agreement that must be filed pursuant to § 252.  Moreover, Qwest's argument is unconvincing because the requirements of § 271 and § 251 are not mutually exclusive.  Indeed, the competitive checklist in § 271 specifically requires Qwest to comply with the obligations in § 251(c)(2) and (3).  See id. § 271(c)(2)(B).  All interconnection agreements that fulfill the duties imposed by § 251(c)(2) or (3) necessarily fulfill competitive checklist obligations, as well.  The QPP Agreement may well have been intended to satisfy the requirements of § 271, but this has no bearing on whether the agreement should also be considered an interconnection agreement under § 252.

We likewise reject Qwest's contention that the Colorado Commission erred in concluding that § 271 included an independent filing requirement.  See Qwest Colo. Br. at 65-67.  This is a spurious interpretation of the Commission's order; the Commission merely noted that the filing of interconnection agreements under § 252 assists it in discharging its § 271(c) obligation to consult with the FCC regarding a BOC's compliance with the competitive checklist.  See In re: the

<u>Application for Approval of Interconnection Agreement Between U.S. West</u>

<u>Commc'ns, Inc., and MCImetro Access Transmission Servs., LLC</u>, Docket No.

96A-366T, Decision No. C04-1349, Order Approving Interconnection Agreement

(P.U.C. Colo. Nov. 16, 2004).  The Commission made its holding very clear:

> We do not accept Qwest's interpretation of the Declaratory Order.
> We believe that the FCC set forth guidelines as to what constitutes an
> interconnection agreement, and intends that state commissions apply
> those guidelines in determining what agreements need to be filed for
> approval.  We believe that the QPP Agreement is an "interconnection
> agreement."  As argued by MCImetro, the agreement, which relates
> to mass market switching and shared transport, is an agreement for
> "network elements," even if they are provided under § 271 of the
> Act.  The QPP Agreement meets the criteria set forth in the FCC
> Declaratory Order . . . for evaluating what is an interconnection
> agreement.  It sets forth ongoing obligations that relate to
> interconnection and unbundled network elements.  As an
> interconnection agreement, it must be filed under § 252(e)(1).
> Indeed, we believe that all agreements which set forth ongoing
> obligations which relate to interconnection and unbundled network
> elements must be filed with this Commission pursuant to § 252(e)(1).

<u>Id.</u> at 8.  We wholly agree.

AFFIRMED.