## McLEODUSA TELECOMMUNICATIONS SERVICES, INC., Plaintiff,

v.

## ARIZONA CORPORATION COMMISSION; et al., Defendants.

No. 2:07–cv–2145–HRH.

United States District Court, D. Arizona.

July 15, 2009.

John Matthew Derstine, Timothy James Sabo, Michael W. Patten, Roshka Dewulf & Patten, PLC, Phoenix, AZ, William A. Haas, McLeodusa Telecommunications Services Inc., Hiawatha, IA, for Plaintiff.

Maureen Ann Scott, Arizona Corporation Commission, Theresa Dwyer–Federhar, Timothy J. Berg, Fennemore Craig PC, Phoenix, AZ, Lisa A. Anderl, Qwest Corporation, Seattle, WA, for Defendants.

### DECISION ON REVIEW

H. RUSSEL HOLLAND, District Judge.

This is an action for judicial review of a decision of the Arizona Corporation Commission, in which it rejected plaintiff's claims. Plaintiff has filed an opening brief,[1] to which defendants have separately responded.[2] Plaintiff has replied.[3] Oral argument was requested and has been heard.

#### Background

Plaintiff is McLeodUSA Telecommunications Services, Inc. Defendants are the

---

1. Docket No. 63.

2. Docket Nos. 66 and 67.

3. Docket No. 68.

Arizona Corporation Commission, the individual commissioners in their official capacities,[4] and Qwest Corporation.

This case arises under the Telecommunications Act of 1996 (the 1996 Act). The 1996 Act was "designed to foster competition in local telecommunications markets." *Pac. Bell v. Cook Telecom, Inc.,* 197 F.3d 1236, 1237 (9th Cir.1999). "The key provisions by which Congress sought to open local telecommunications markets to competition are 47 U.S.C. §§ 251 and 252." *Id.*

Section 251 of the 1996 Act imposes a host of duties upon incumbent local exchange carriers (ILECs), the most important of which is a duty to share their networks with local telephone providers, known as competitive local exchange carriers (CLECs). In this case, McLeodUSA is the CLEC and Qwest is the ILEC. ILECs can "offer access to their local networks, either by selling local telephone service to [CLECs] at wholesale rates, by leasing parts of their networks, or by allowing competitors to connect to their networks."[5] *AT & T Commc'ns of Cal. Inc. v. Pac. Bell Tel. Co.,* 375 F.3d 894, 897–98 (9th Cir.2004).

"[S]ection 252 of the [1996] Act permits carriers to contract independently for interconnection and the provision of goods and services." *MCI Telecommc'ns Corp. v. U.S. West Commc'ns,* 204 F.3d 1262, 1266 (9th Cir.2000). "If the carriers do not reach an independent agreement within a specified period, the parties may petition the state agency responsible for regulating local telecommunications to arbitrate the open issues." *Id.* "All interconnection agreements, whether reached independently or through arbitration, must be approved by the state agency[.]" *Id.* The state agency responsible for regulating local telecommunications in Arizona is the Arizona Corporation Commission ("the Commission"). A CLEC may also "'opt in'" to an ICA that the ILEC has with another CLEC. *BellSouth Telecommc'ns, Inc. v. Se. Tel., Inc.,* 462 F.3d 650, 653 (6th Cir.2006).

Section 251(d)(1) of the 1996 Act required the Federal Communications Commission (FCC) to adopt regulations for the implementation of Section 251. Section 251(c)(2), which addresses interconnection; Section 251(c)(3), which addresses unbundled network elements;[6] and Section 251(c)(6), which addresses collocation[7]—all contain a requirement that an ILEC provide these items to CLECs on "rates, terms and conditions that are just, reasonable, and nondiscriminatory." The FCC established rules which govern an ILEC's obligation to provide interconnection on a nondiscriminatory basis in its First Report and Order. The FCC concluded "that Congress did not intend the term 'nondiscriminatory' in the 1996 Act be synony-

---

4. The commissioners are Mike Gleason, William Mundell, Jeff Hatch–Miller, Kristin Mayes, and Gary Pierce.

5. The rationale behind allowing a CLEC to utilize an ILEC's existing network is that it is prohibitively expensive to duplicate what is referred to as the "last mile" of a telecommunications network. The "last mile" is the portion of the network that links a central office to the end user.

6. "[U]nbundling is the procedure by which the components of an ILEC's facilities and provision of services are broken down into their individual parts. Thus, to 'unbundle' a network element is simply to set a separate price for that element and allow a purchaser ... the ability to lease it separately." *MCI v. Bell–Atlantic,* 36 F.Supp.2d 419, 423 (D.D.C. 1999).

7. This case involves physical collocation which is "an offering that enables a requesting carrier to locate its own transmission equipment in a segregated portion of the [ILEC's] central office." *In re BellSouth Corp.,* 13 F.C.C.R. 539, 640 (Dec. 24, 1997).

mous with 'unjust and unreasonable discrimination' used in the 1934 act,[8] but rather, intended a more stringent standard."[9] Thus, the FCC:

> reject[ed] for purposes of section 251, [its] historical interpretation of "nondiscriminatory" which [it] interpreted to mean a comparison between what the incumbent LEC provided other parties in a regulated monopoly environment. We believe that the term "nondiscriminatory," as used throughout section 251, applies to the terms and conditions an incumbent LEC imposes on third parties as well as on itself.[10]

In the First Report and Order, the FCC also defined an ILEC's obligation to provide nondiscriminatory access to unbundled network elements:

> [W]e conclude that the phrase "nondiscriminatory access" in section 251(c)(3) means at least two things: first, the quality of an unbundled network element that an incumbent LEC provides, as well as the access provided to that element, must be equal between all carriers requesting access to that element; second, where technically feasible, the access and unbundled network element provided by an incumbent LEC must be at least equal-in-quality to that which the incumbent LEC provides to itself.[11]

Although the FCC addressed collocation in its First Report and Order, it did not specifically discuss the nondiscrimination requirement set forth in Section 251(c)(6).

In 2000, McLeodUSA opted into an interconnection agreement (ICA) that Qwest had with Pathnet, Inc. The ICA[12] was approved by the Commission. The ICA provides that Qwest will provide DC power to the equipment that McLeodUSA collocates in Qwest's central offices. In order to provide DC power, Qwest has equipment in its central offices that converts AC power to DC power. This equipment includes batteries, rectifiers, and generators. The equipment is referred to collectively as the DC power plant. All users of DC power in a central office are served by the same DC power plant. Separate power distribution cables carry the DC power from the DC power plant to each carrier's equipment. The power distribution cables are not considered part of the power plant.

The ICA also provides that the Agreement would "reflect the outcome of generic pricing proceedings by the Commission."[13] A generic price proceeding, referred to herein as the Cost Docket, was commenced by the Commission in 2001. McLeodUSA participated in the Cost Docket. In the Cost Docket, the Commission adopted Qwest's proposed power rates,[14] which were subsequently set out in

---

**8.** Section 202(a) of the 1934 Telecommunications Act prohibits "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service[.]" 47 U.S.C. § 202(a).

**9.** *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, 15612, ¶ 217 (Aug. 8, 1996). (A portion of the First Report and Order is attached as Appendix D to McLeodUSA's Opening Brief, Docket No. 63).

**10.** *Id.* ¶ 218.

**11.** *Id.* at 15658, ¶ 312.

**12.** Local Interconnection Agreement between Qwest (f/k/a U S West Communications, Inc.) and McLeodUSA Telecommunications Services, Inc., for the State of Arizona, a portion of which is attached as Appendix B to McLeodUSA's Opening Brief, Docket No. 63–3.

**13.** ICA at Section (A)1.2, *see* Qwest Corporation's Answering Brief at 6, Docket No. 66.

**14.** Decision No. 64922 at 44, Appendix A, Qwest Corporation's Answering Brief, Docket No. 66–2.

Exhibit A to the ICA.[15] The Commission expressly concluded that "[t]he prices for unbundled network elements are 'based on the cost (determined without reference to a rate of return or other rate-based proceeding) of providing the interconnection or network element . . . [and are] nondiscriminatory.'"[16]

Exhibit A sets out the two "rate elements" that Qwest charges for the DC power it provides to McLeodUSA.[17] McLeodUSA is charged for "DC power plant", which represents its share of the cost of the DC power plant. McLeodUSA is also charged for "power usage," which represents the actual power that McLeodUSA uses to run its collocated equipment. Prior to July 2004, both the "DC power plant" and the "power usage" rate elements were charged based on the amount of power McLeodUSA had "ordered."

The amount of power that McLeodUSA "ordered" was based on its order for power distribution cables.[18] Qwest's collocation application provides options for ordering power distribution cables in 20 amps, 30 amps, 40 amps, 60 amps, or some other size chosen by the CLEC.[19] McLeodUSA orders its "power distribution cables based on the List 2 requirements that it ulti-

mately expects its equipment to draw over the relevant planning horizon[.]"[20] List 2 drain represents peak current under "worst case" conditions of voltage, traffic, and similar items.

Qwest's power plant is designed to have sufficient capacity to accommodate both Qwest and the CLECs. Qwest does not "charge" itself for DC power plant which, pursuant to interconnection agreements, is shared by Qwest with all of the CLECs. These circumstances were accounted for in the Cost Docket. There, use of the power plant was imputed to Qwest for purposes of spreading amongst all users the cost of constructing and maintaining the power plant. In the Cost Docket, Qwest's allocation of power plant costs was based upon its experience-based use of the power plant;[21] whereas allocation to the CLECs was based upon the combined amperage rating of the power distribution cabling requested by all of the CLECs. Qwest's proposed rates, thus constructed, were found by the Commission to be just, reasonable, and nondiscriminatory.[22]

In July 2004, McLeodUSA began considering whether to enter into an amendment of the ICA.[23] On August 12, 2004, McLeodUSA and Qwest entered into the

---

**15.** Exhibit MS–3, Rebuttal Testimony of Michael Starkey, Tab A–18, Administrative Record, Docket No. 40.

**16.** Decision No. 64922 at 84, Appendix A, Qwest Corporation's Answering Brief, Docket No. 66–2.

**17.** Exhibit MS–3 at 2, Rebuttal Testimony of Michael Starkey, Tab A–18, Administrative Record, Docket No. 40.

**18.** Hearing Testimony of Michael Starkey at 54, lns. 3–13, Tab B–2, Administrative Record, Docket No. 51.

**19.** Sample Collocation Application Form at 9, Exhibit MS–4, Rebuttal Testimony of Michael Starkey, Tab A–19, Administrative Record, Docket No. 40.

**20.** Hearing Testimony of Sidney L. Morrison at 138, ln. 23–139, ln. 3, Tab B–2, Administrative Record, Docket No. 52.

**21.** *See* Response Testimony of Curtis Ashton at 4–5, Tab A–16, Administrative Record, Docket No. 34. The use imputed to Qwest is based on List 1 drain, which is "the current the equipment will draw when operating normally at maximum capacity[.]" *Id.* at 4.

**22.** *See* Decision No. 64922 at 84, Appendix A, Qwest Corporation's Answering Brief, Docket No. 66–2.

**23.** *See* Email from Sherry L. Krewett to Mark E. McCune (dated July 19, 2004), Response to Data Request No. 2, Tab C–15, Administrative Record, Docket No. 56–5.

DC Power Measuring Amendment, which amended the ICA "by adding the terms, conditions and rates for DC Power Measuring, as set forth in Attachment 1[.]" [24] Attachment 1 is entitled "DC Power Measuring" and has two sections: Section 1.0 is entitled "Monitoring" and Section 2.0 is entitled "Rate Elements—All Collocation." [25] Section 1.0 provides:

1.1. CLEC orders DC power in increments of twenty (20) amps whenever possible. If CLEC orders an increment larger than sixty (60) amps, engineering practice normally terminates such feed on a power board. If CLEC orders an increment smaller than or equal to sixty (60) amps, the terminations will normally appear on a Battery Distribution Fuse Board (BDFB).

1.2. If CLEC orders sixty (60) amps or less, it will normally be placed on a BDFB where no monitoring will occur since the power usage rate reflects a discount from the rates for those feeds greater than sixty (60) amps. If CLEC orders more than sixty (60) amps of power, it normally will be placed on the power board. Qwest will monitor usage at the power board on a semi-annual basis. However, Qwest also agrees to take a reading within thirty (30) Days of a written CLEC request, after CLEC's installation of new equipment. Qwest will perform a maximum of four (4) readings per year on a particular collocation site. Based on these readings, if CLEC is utilizing less than the ordered amount of power, Qwest will reduce the monthly usage rate to CLEC's actual use. If CLEC is utilizing more than the ordered amount, Qwest will increase the monthly usage rate to the CLEC's actu-

al use. Until such time that CLEC places equipment and a request is received from CLEC to monitor, Qwest will bill CLEC based on the amount of power ordered. Once Qwest receives a CLEC monitoring request, it will bill the actual power usage rate from the date of the CLEC's monitoring request until the next reading. The next reading date may be generated as a result of the CLEC request or a Qwest routine reading and Billing will be adjusted on whichever date comes first.[ [26] ]

Section 2.0 provides:

2.1 –48 Volt DC Power Usage and AC Usage Charges. Provide –48 volt DC power to CLEC collocated equipment and is fused at one hundred twenty-five percent (125%) of request. The DC Power Usage Charge is for the capacity of the power plant available for CLEC's use. The AC Usage Charge is for the power used by CLEC. Both the DC Power Usage Charge and the AC Usage Charge are applied on a per ampere basis.

2.2 The –48 Volt DC Power Usage Charge is specified in Exhibit A of the Agreement and applies to the quantity of –48 Volt Capacity specified by the CLEC in its order.

2.2.1 –48 Volt DC Power Usage Charge—Applies on a per amp basis to all orders of greater than sixty (60) amps. Qwest will initially apply the –48 Volt DC Power Usage Charge from Exhibit A of the Agreement to the quantity of power ordered by CLEC. Qwest will determine the actual usage at the power

---

**24.** DC Power Measuring Amendment to the Interconnection Agreement between Qwest Corporation and McLeodUSA Telecommunications Services, Inc., for the State of Arizona, at 1, Appendix C, McLeodUSA's Opening Brief, Docket No. 63–4.

**25.** *Id.* at 3.

**26.** *Id.*

board as described in Section 1.2[.] There is a one amp (1) minimum charge for –48 Volt DC Power Usage.

2.3 CLEC rates for Collocation must be included in CLEC's existing Interconnection Agreement with Qwest prior to amending with DC Power Monitoring (Measuring) Amendment.[27]

Exhibit A to the ICA, to which subsection 2.2 of the Amendment refers, is the Pricing Appendix that was prepared after the completion of the Cost Docket. The relevant section of Exhibit A is Section 8.0 entitled "Collocation" and more specifically, subsection 8.1.4 which is entitled "Power Usage."[28] Subsection 8.1.4 sets forth the rate elements for "Power Usage" as follows:

| | | | | Recurring [Charges] |
|---|---|---|---|---|
| 8.1.4 | Power Usage | | | |
| | 8.1.4.1 | –48 Volt DC Power Usage, per Ampere, per Month | | |
| | | 8.1.4.1.1 | Power Plant | |
| | | | 8.1.4.1.1.1 Greater than 60 Amps | $10.75 |
| | | | 8.1.4.1.1.2 Equal to 60 Amps | $10.75 |
| | | | 8.1.4.1.1.3 Less than 60 Amps | $10.75 |
| | | 8.1.4.1.2 | Power Usage | |
| | | | 8.1.4.1.2.1 Less than 60 Amps, per Amp | $ 3.64 |
| | | | 8.1.4.1.2.2 More than 60 Amps, per Amp | $ 7.27[29] |

Although subsection 8.1.4 of Exhibit A to the ICA is titled "Power Usage" and refers to "–48 Volt DC Power Usage, per ampere, per month," subsection 8.1.4 was intended to set forth the monthly, recurring charges to McLeodUSA for both the DC power plant and the power usage rate elements based upon McLeodUSA's order for power distribution cables.

In May 2005, as a result of an internal audit, McLeodUSA's auditors observed that Qwest was continuing to charge "DC power plant" on an "as-ordered" basis while charging "power usage" based on actual use ("as-measured") basis. McLeodUSA contended that the intent of the Amendment was to change the manner in which it was charged for both "DC power plant" and "power usage." McLeodUSA contended that Qwest should be charging it for "DC power plant" based upon the amount of power McLeodUSA actually used, rather than upon the amount of power that McLeodUSA originally ordered. Qwest disagreed, contending that the Amendment only applied to the "power usage" rate element and that the "DC power plant" rate element should still be charged on an "as ordered" basis.

On February 21, 2006, McLeodUSA filed a complaint against Qwest with the Commission. McLeodUSA alleged: (1) that it was being overcharged by Qwest for DC power plant in violation of the ICA and the 2004 Amendment, and (2) that Qwest was violating its statutory non-discrimination duty under the 1996 Act. Following an evidentiary hearing, the administrative law judge (ALJ) issued a Recommended Opinion and Order (ROO). The Commission considered the ALJ's ROO at its August 2007 meeting. On August 23, 2007, the Commission issued Decision No. 69872, which adopted the ALJ's ROO with modification.[30]

27. *Id.*

28. Pricing Appendix (Exhibit A) at 2, Exhibit MS–3, Rebuttal Testimony of Michael Starkey, Tab A–18, Administrative Record, Docket No. 40.

29. *Id.*

30. *See* Decision No. 69872, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

In Decision No. 69872, the Commission devotes sixteen pages to repeating the contentions of the parties and less than three pages to fact-finding that is largely conclusory. Based on this fact-finding, the Commission reached the following three conclusions:

(1) that "[t]he language of the Amendment and Exhibit A to the ICA are ambiguous on their face as to the intent of the parties concerning the method of billing for the DC Power Charges[;]"

(2) that "McLeod has not demonstrated that when the Amendment was executed ... the parties intended that Qwest was to bill all DC power charges on an 'as used' basis[;]" and

(3) that "McLeod has not demonstrated on the record in this proceeding that Qwest's DC Power rate impermissibly discriminates against McLeod."[31]

On November 2, 2007, McLeodUSA commenced this action for declaratory and injunctive relief. In count I of its complaint, McLeodUSA alleges that the Commission's final order violates Sections 251 and 252 of the 1996 Act. In count II of its complaint, McLeodUSA alleges that the Commission's interpretation of the ICA and the Amendment was not in accordance with law and was arbitrary and capricious.

### Standard and Scope of Review

The 1996 Act vests district courts with jurisdiction to determine whether interconnection agreements meet the requirements of the Act. 47 U.S.C. § 252(e)(6). The court reviews the Commission's interpretation and application of the 1996 Act *de novo*. *See Verizon Calif., Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir.2006). The Commission's factual findings are reviewed under an arbitrary and capricious standard. *Id.* "A state commission's decision is arbitrary and capricious if the decision 'was not supported by substantial evidence,' or the commission made a 'clear error of judgment.'" *Id.* (quoting *Pac. Bell v. Pac. West Telecomm. Inc.*, 325 F.3d 1114, 1131 (9th Cir.2003) (internal quotation marks omitted)).

This case also involves the Commission's interpretation and application of state contract law. The parties disagree as to what standard of review applies to the Commission's interpretation of Arizona law. McLeodUSA argues that a *de novo* review standard applies to the Commission's interpretation and application of Arizona contract law, in large part because under Arizona law contract interpretation is a question of law. The Commission and Qwest contend that an arbitrary and capricious standard applies to the Commission's interpretation and application of Arizona contract law.

The Ninth Circuit has never expressly considered what standard of review should apply to a state telecommunications agency's state law legal conclusions. Other circuits which have considered this issue have concluded that the arbitrary and capricious standard applies. *See Connect Commc'ns Corp. v. Sw. Bell Tel., L.P.*, 467 F.3d 703, 708–09 (8th Cir.2006); *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 454 F.3d 91, 96 (2d Cir.2006); *Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir.2003); *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*, 235 F.3d 493, 498 (10th Cir.2000); *Sw. Bell Tel. Co. v. Public Utility Comm'n of Texas*, 208 F.3d 475, 482 (5th Cir.2000). The court has some doubts about whether an arbitrary and capricious standard should apply to a question of contract interpretation which, in Arizona, is a matter of law. However, in this instance, regardless of whether the court applies a *de novo*

---

**31.** *Id.* at 26, ¶¶ 7–9.

standard or an arbitrary and capricious standard to the Commission's interpretation of the Amendment, the result is the same.

### Discussion

McLeodUSA challenges Decision No. 69872 on two grounds. First, McLeodUSA contends that the Commission applied an incorrect nondiscrimination standard and thus has allowed Qwest, in violation of Sections 251 and 252 of the 1996 Act, to provide collocation power to McLeodUSA on terms and conditions that are less favorable than Qwest uses for the provision of power to itself. Second, McLeodUSA contends that the Commission erred in interpreting the 2004 Amendment because it failed to consider the Amendment in light of the nondiscrimination provision in the ICA. These issues are discussed in reverse order herein.

### Contract Interpretation (Count Two—Commission's interpretation is arbitrary and capricious)

Interpretation of the ICA as amended is governed by Arizona law. "[I]n Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134, 1138 (1993). "When interpreting a contract ... it is fundamental that a court attempt to 'ascertain and give effect to the intention of the parties at the time the contract was made if at all possible.'" *Id.* at 1139 (quoting *Polk v. Koerner*, 111 Ariz. 493, 533 P.2d 660, 662 (1975)). "Contracts are to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity." *Harris v. Harris*, 195 Ariz. 559, 991 P.2d 262, 265 (Ariz.Ct.App.

1999). "Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *In re Estate of Lamparella*, 210 Ariz. 246, 109 P.3d 959, 963 (Ariz.Ct.App.2005). The court may consider extrinsic evidence to determine the meaning intended by the parties. *Taylor*, 854 P.2d at 1140. "A contract must be construed so that every part is given effect, and each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing.... [T]he court will not construe one provision in a contract so as to render another provision meaningless." *Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 855 P.2d 787, 791 (Ariz.Ct.App.1993).

The Commission concluded that "[t]he language of the Amendment and Exhibit A to the ICA are ambiguous on their face as to the intent of the parties concerning the method of billing for the DC Power Charges" and that McLeodUSA did "not demonstrate[ ] that when the Amendment was executed ... the parties intended that Qwest was to bill all DC power charges on an 'as used' basis." [32] Qwest challenges the Commission's conclusion that the Amendment was ambiguous and McLeodUSA challenges the Commission's conclusion that the evidence supported Qwest's interpretation of the Amendment.

Turning first to the ambiguity issue, the Commission stated:

97. Section 1.2 of the Amendment appears to address only the power usage rate. However, ambiguity is introduced into the Amendment from the language and interrelationship of several provisions in section 2 of the Amendment. Section 2.1 provides in part: "The DC Power Usage Charge is for the capacity

---

**32.** Decision No. 69872 at 26, ¶¶ 7–8, Appendix A, McLeodUSA's Opening Brief, Docket

No. 63–2.

of the power plant available for CLECs use." Section 2.2 provides: "The –48 Volt DC Power Usage Charge is specified in Exhibit A of the Agreement and applies to the quantity of –48 Volt Capacity specified by the CLEC in its order." Section 2.2.1 provides in relevant part: "Qwest will initially apply the –48 Volt DC Power Usage Charge from Exhibit A of the Agreement to the quantity of power ordered by CLEC. Qwest will determine the actual usage at the power board as described in Section 1.2"

98. The only time the term "–48 Volt DC Power Usage" appears in Exhibit A is as a heading, designated as line item 8.1.4.1. There is no rate element associated with item 8.1.4.1, it is clearly a heading, under which there appear two distinct charges: "Power Plant" and "Power Usage."

99. Qwest's interpretation, that the Amendment only affects the Power Usage component for cables greater than 60 amps, is consistent with the language of the Amendment. However, because Section 2.2.1 appears to reference "as measured billing" to the entire scope of "–48 Volt DC Power Usage" which encompasses both the Power Plant and the Power Usage rate elements, we cannot find that the Amendment is without ambiguity, or that McLeod is wrong in its interpretation solely by looking at the language of the Amendment.[33]

The Commission's above findings based upon the Amendment itself are neither arbitrary nor capricious. They are supported by the written terms of the Amendment and are not contrary to Arizona law. If reviewed on a *de novo* standard, the court would reach the same conclusion as did the Commission.

To say that Exhibit A to the ICA and the Amendment are poorly written is an understatement. Viewed in the light of the entire Amendment, including the Attachment and Exhibit A of the ICA, the sentence "the DC Power Usage Charge is for the capacity of the Power Plant available for CLEC use" is ambiguous. It conflates without explanation the very different rate elements of usage (the power actually drawn by a CLEC) and DC power plant capacity (the availability or potential of the plant to provide the CLEC with power). In light of the fact that originally, and even now, some billings may include a charge for usage based upon the capacity of the cables ordered by the CLEC, it is certainly not surprising that there would be some marrying of the power usage charge and DC power plant charge, but they are very different concepts. Power usage and DC power plant are separate and distinct rate elements, a distinction that is blurred in Exhibit A, Section 8.1.4 of the ICA, and the Attachment to the Amendment, thereby making the Amendment ambiguous. It is conceptually wrong to say that DC power usage charges are for the capacity of power plant available to a CLEC. The parties agree that the "power usage" rate element was intended to have reference to the actual amount of power drawn by a CLEC. The amount of power "ordered" is a separate but related concept having to do with cable capacity. "DC power plant" is a distinct rate element with a discrete charge.[34] The Commission correctly found that the Amendment was ambiguous.

Having found ambiguity, the Commission then considered extrinsic evidence to discern the parties' intent and found that the evidence supported Qwest's interpreta-

---

33. *Id.* at 23–24, ¶¶ 97–99.

34. Pricing Appendix (Exhibit A), Exhibit MS–3, Rebuttal Testimony of Michael Starkey, Tab A–18, Administrative Record, Docket No. 40.

tion of the Amendment. The Commission stated:

95. We find that the evidence supports Qwest's interpretation of the meaning of the Amendment, i.e. that the Amendment only changed the method of billing for power usage greater tha[n] 60 amps, and did not change the method of billing for power plant capacity. This interpretation is supported by the language of the Amendment itself, as further supported by extrinsic evidence.[ [35]]

McLeodUSA argues that the Commission erred in relying on extrinsic evidence. McLeodUSA contends that the Commission failed to consider the entire ICA, of which the Amendment is a part, in determining the parties' intent. In particular, McLeodUSA argues that the Commission failed to consider Section (D)2.1 of the ICA, which states that Qwest "shall provide Collocation in a nondiscriminatory manner on rates, terms and conditions that are just, reasonable and nondiscriminatory." [36] Had the Commission viewed the Amendment in light of Section (D)2.1, McLeodUSA argues that it would not have had to resort to extrinsic evidence to discern the parties' intent.

There is no merit to McLeodUSA's contention. Having found (correctly) that the Amendment was ambiguous, the Commission was entitled to consider extrinsic evidence under Arizona law. *See Taylor*, 854 P.2d at 1140. In addition to considering Exhibit A of the ICA, the Commission expressly dealt with the discrimination is-

sue,[37] the merits of which issue the court addresses below. That the Commission did not cite Section (D)2.1 of the ICA is irrelevant.

The Commission's conclusion that the extrinsic evidence supported Qwest's interpretation of the Amendment was supported by substantial evidence. The extrinsic evidence that the Commission considered included:

(1) the fact that prior to entering into the Amendment, both DC power plant and power usage were billed on an "as ordered" basis;

(2) the fact that McLeodUSA did not object to Qwest's billing under the Amendment until May 2005;

(3) a spreadsheet that McLeodUSA prepared to analyze the potential savings it would achieve if it executed the Amendment in which McLeodUSA only tracked expected savings from the power usage charge;

(4) the fact that none of McLeodUSA's witnesses had reviewed the Amendment prior to McLeodUSA executing it;

(5) Qwest's Change Management Process, during which Qwest made clear that only the power usage rate element would be impacted by the Amendment;[38]

(6) Qwest's Product Catalog, which contained a detailed explanation of the Power Measuring Amendment, and only discusses how power usage will be measured;[39] and

---

35. Decision No. 69872 at 23, ¶ 95, Appendix A, McLeodUSA's Opening Brief, Docket No. 63-2.

36. ICA at 55, a portion of which is attached as Appendix B to McLeodUSA's Opening Brief, Docket No. 63-3.

37. *See* Decision No. 69872 at 25, ¶¶ 106-107, Appendix A, McLeodUSA's Opening Brief, Docket No. 63-2.

38. *See* Exhibit WRE-2 at 3-4, Response Testimony of William R. Easton, Tab C-1, Administrative Record, Docket No. 54-2.

39. *See* Exhibit WRE-1 at 1-2, Response Testimony of William R. Easton, Tab C-1, Administrative Record, Docket No. 54-2.

**1014**

(7) the collocation cost study that was submitted in the Cost Docket, which clarifies that Qwest originally intended to bill DC power plant on an "as ordered" basis.

This evidence all supports Qwest's interpretation of the Amendment.

In sum, the Commission's finding that the Amendment was ambiguous was correct as a matter of law and was not arbitrary or capricious. Its finding that the extrinsic evidence supported Qwest's interpretation of the Amendment was supported by substantial evidence and was not arbitrary or capricious. On a de *novo* review, the court would reach the same conclusion that the Commission did and adopt Qwest's interpretation of the Amendment.

### *Nondiscrimination Standard (Count One—violations of Sections 251 and 252)*

With respect to the discrimination issue, the Commission made the following findings:

96. We find further that McLeod has not demonstrated that the Amendment is discriminatory against McLeod.

. . . .

106. The record in this proceeding does not support a finding that Qwest's interpretation of the Amendment discriminates against McLeod. Section 252 of the Act provides that carriers can negotiate and enter into ICAs without regard to the non-discrimination provi[sions] of the Act. McLeod voluntarily paid the capacity charge on an "as-ordered" basis for several years.

107. McLeod's evidence that Qwest charges CLECS for collocation power differently from how Qwest imputes the costs of such power to itself is not sufficient to support a finding that Qwest's DC power charges are improperly discriminatory. An ILEC may charge different rates than it imputes to itself as long as such rates are reasonable. Qwest provided evidence that distinguishes its situation from that of a collocating CLEC and that would support and justify its billing practices. We find that McLeod has not demonstrated on this record that Qwest is improperly discriminating against it in the imposition of the DC Power charges.[40]

Finally, the Commission concluded that:

McLeod has not demonstrated on the record in this proceeding that Qwest's DC Power rate impermissibly discriminates against McLeod.[41]

The 1996 Act imposes upon ILECs certain obligations, including a duty to negotiate, a duty to interconnect ILEC and CLEC facilities, and collocate on ILEC premises equipment of a CLEC. With respect to the collocation of CLEC equipment in ILEC offices, Section 251(c)(6) addresses "rates, terms, and conditions" for "physical collocation of equipment necessary for interconnection." 47 U.S.C. § 251(c)(6). Rates, terms, and conditions are required to be "just, reasonable, and nondiscriminatory." *Id.* Overall interconnection arrangements are subject to the same requirements. 47 U.S.C. § 251(c)(2)(D).

McLeodUSA contended in its complaint before the Commission that Qwest had violated its statutory duty and was "discriminating against McLeodUSA in favor of itself . . . ."[42] In its complaint before this court, McLeodUSA contends that "[t]he Commission's Final Order violates Section

**40.** Decision No. 69872 at 23–25, ¶¶ 96, 106–107, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

**41.** *Id.* at 26, ¶ 9.

**42.** Complaint at 3, ¶ 11, Tab A–1, Administrative Record, Docket No. 29.

251(c)(6) and the FCC's implementing orders because it permits Qwest to apply its rates, terms, and conditions associated with collocation power in a discriminatory manner." [43]

McLeodUSA challenges both the Commission's implicit finding that the nondiscrimination requirements of Section 251 do not apply to the ICA and the Amendment [44] and the Commission's express finding that there was no discrimination. [45] As to the latter challenge, McLeodUSA argues that the Commission applied a reasonableness standard to the nondiscrimination issue, which was less stringent than that expressed by the FCC in its First Report and Order.

The 1996 Act addresses agreements arrived at between ILECs and CLECs through voluntary negotiations, mediation, or compulsory arbitration. Here, we are dealing with voluntary agreements between Qwest and McLeod. With respect to such agreements, Section 252(a)(1) expressly provides:

> [A]n incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers *without regard to* the standards set forth in subsections (b) and (c) of section 251 of this title.

47 U.S.C. § 252(a)(1) (emphasis added). Subsection (a)(1) further provides that agreements between incumbent and competing carriers must "include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement." *Id.*

"[T]he 'without regard' clause indicates that 'the parties may make agreements that go beyond or contradict the specific statutory requirements that an incumbent must follow.' " *Qwest Corp. v. Public Utilities Comm'n of Colo.*, 479 F.3d 1184, 1188 (10th Cir.2007) (quoting James B. Speta, *Antitrust and Local Competition under the Telecommunications Act*, 71 Antitrust L.J. 99, 119 (2003)). As the Ninth Circuit has recognized, "[t]he reward for reaching an independent agreement is exemption from the substantive requirements of subsections 251(b) and 251(c)." *MCI Telecommc'ns Corp. v. U.S. West Commc'ns*, 204 F.3d 1262, 1266 (9th Cir.2000). In its First Report and Order, the FCC also recognized that Section 251 rules do not apply to negotiated agreements. Commissioner Rachelle B. Chong, writing "separately to emphasize my strong belief that the pro-competitive path we have unanimously chosen in this interconnection order is the right one," observed:

> [t]he 1996 Act has made the mechanism for entry a free market negotiation process between the incumbent LEC and any potential new competitor. Under Section 252(a)(1), the Commission's Section 251 rules play no role if an incumbent LEC and a new entrant reach a purely voluntary agreement, and the state commission approves it through the process set forth in Section 252.[ [46]]

McLeodUSA challenges the Commission's implicit finding that Section 252 of the 1996 Act permitted McLeodUSA and Qwest to negotiate their ICA and the amendment to it without regard to the statutory nondiscrimination requirement of Section 251(c)(6). McLeodUSA argues that the nondiscrimination provisions of Section 251(c)(6), pursuant to Arizona law, are incorporated into the parties' ICA.

---

**43.** Complaint at 10, ¶ 29, Docket No. 1.

**44.** *See* Decision No. 69872 at 25, ¶ 106, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

**45.** *Id.*, ¶ 107.

**46.** *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, 16248–16250 (Aug. 8, 1996).

However, this contention, which is not wholly inapposite, overlooks the fact that Arizona law would incorporate Section 252(a)(1) as well as Section 251(c)(6). Because the parties negotiated an ICA, they were free to agree upon contract terms "without regard to the standards set forth in subsections (b) and (c) of section 251[.]" 47 U.S.C. § 252(a)(1).

McLeodUSA concedes that carriers *may* enter into interconnection agreements "without regard" to Section 251(c) non-discrimination standards. However, McLeodUSA contends that the parties incorporated the Section 251(c)(6) nondiscrimination standard into the ICA and thus the statutory standard applies here, even though the ICA and the Amendment were voluntary agreements. Section (D)2.1 of the ICA states that Qwest "shall provide Collocation in a nondiscriminatory manner on rates, terms and conditions that are just, reasonable and nondiscriminatory." [47] By using the exact language that is used in Section 251(c)(6) of the 1996 Act,[48] McLeodUSA argues that it is clear that the parties intended to incorporate the Section 251(c)(6) standard into the ICA.

While the Commission certainly examined the intent of Qwest and McLeodUSA in entering into their ICA as amended, the Commission made no finding with respect to whether or not the parties intended to incorporate the just, reasonable, and non-discriminatory term of Section 251(c)(6) into the ICA. Clearly, however, the Commission realized that the ICA contained a just, reasonable, and nondiscriminatory clause, for the Commission expressly dealt with the subject of reasonableness and nondiscrimination as set out in the above quoted findings. Inasmuch as the Commission was required to give effect to the entirety of the parties' ICA, it was most certainly appropriate for the Commission to address the just, reasonable, and non-discrimination clause of the parties' ICA, and the Commission did so. In the absence of an express finding as to the parties' intent in employing a just, reasonable, and nondiscrimination standard in their ICA, and because the parties employed the exact words used by Congress in Section 251(c)(6), the court will assume for purposes of further discussion that the Commission should have employed the FCC's Section 251 nondiscrimination standard in evaluating whether Qwest was impermissibly discriminating against McLeodUSA in charging for DC power plant.

McLeodUSA contends that in making its reasonableness and nondiscrimination determinations, the Commission employed the wrong standard. McLeodUSA contends that the Commission employed a "reasonableness" standard rather that the more stringent standard set out in the FCC's First Report and Order. As set out in greater detail above, in its First Report and Order, the FCC concluded that just, reasonable, and nondiscriminatory for purposes of Section 251 involved more than "a comparison between what the incumbent LEC provide[s] others in a regulated monopoly environment." [49] Rather,

---

**47.** ICA at 55, Appendix B to McLeodUSA's Opening Brief, Docket No. 63–3.

**48.** Section 251(c)(6) provides that an ILEC has

> [t]he duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier,

except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

47 U.S.C. § 251(c)(6) (emphasis added).

**49.** *In re Implementation of the Local Competition Provisions in the Telecommunications Act*

"the term 'nondiscriminatory,' as used throughout section 251 applies to terms and conditions an incumbent LEC imposes on third parties as well as on itself." [50] This is exactly the comparison which the Commission made in its findings. In Commission Finding 107,[51] the Commission expressly compares Qwest's DC power charges to McLeodUSA with the different rates that are imputed to Qwest itself. The court concludes that the Commission did not employ an incorrect nondiscrimination standard, even if the terms of Section 251(c)(6) were incorporated into the parties' ICA.

■ We turn next to the question of whether or not the Commission correctly applied the FCC's nondiscrimination standard to the facts of this case. As quoted above, the Commission found that the differing rate bases as between Qwest and McLeodUSA (one based upon imputed costs and the other based upon power cable orders) were reasonable, that Qwest had distinguished its situation from that of a collocating CLEC, and that McLeodUSA had not demonstrated that Qwest's rates for DC power plant were discriminatory.

The differing treatment of Qwest and McLeodUSA as to power plant charges has its origins in the Cost Docket, which was contemplated by the ICA and in which McLeodUSA participated. It was in that proceeding that the Commission gave full consideration and approval to imputing costs of DC power plant to Qwest on the basis of its List 1 drain and the billing of costs of DC power plant to McLeodUSA on the basis of the amperage of power cable orders (List 2 drain). In those proceedings, the Commission determined that Qwest's proposed rates were just, reasonable, and nondiscriminatory.[52] McLeodUSA did not challenge that finding. It became administratively final. The charges approved in the Cost Docket were incorporated into the ICA as Exhibit A.

■ Just as legal proceedings can lead to barring of re-litigation under the doctrine of *res judicata*, so too final administrative decisions have a *res judicata* effect. *See Lyle v. Sec. of Health and Human Srvcs.*, 700 F.2d 566, 568 n. 2 (9th Cir.1983) ("*Res judicata* principles are properly applied in the context of administrative decisions[.]"). *Res judicata* encompasses both claim and issue preclusion. *See U.S. v. Bhatia*, 545 F.3d 757, 759 (9th Cir.2008). "[I]ssue preclusion ... provides that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *Id.* (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)).

■ In the Cost Docket, the Commission considered whether it was discriminatory for Qwest to charge McLeodUSA for DC power plant on an "as ordered" basis when Qwest did not impute DC power plant costs to itself on the same basis. The Commission found Qwest's DC power plant rates to be nondiscriminatory. That this issue was decided by a state tribunal, rather than a federal court is of no import. "[F]ederal courts give preclusive effect to the findings of state administrative tribunals in subsequent actions" if certain re-

---

*of 1996,* First Report and Order, 11 F.C.C.R. 15499, 15612, ¶ 218 (Aug. 8, 1996).

**50.** *Id.*

**51.** Decision No. 69872 at 25, ¶ 107, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

**52.** *See* Decision No. 64922 at 84, Appendix A, Qwest Corporation's Answering Brief, Docket No. 66–2.

quirements are met. *Miller v. County of Santa Cruz,* 39 F.3d 1030, 1032 (9th Cir. 1994). Those requirements are "(1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate." *Id.* at 1033. "[T]he threshold inquiry for a court deciding whether to give preclusive effect to a state administrative adjudication, is to determine whether the state administrative proceeding was conducted with sufficient safeguards to be equated with a state court judgment." *Plaine v. McCabe,* 797 F.2d 713, 719 (9th Cir.1986). The decisions of the Arizona Corporation Commission are given preclusive effect in Arizona state courts. *See Ariz. Pub. Serv. Co. v. S. Union Gas Co.,* 76 Ariz. 373, 265 P.2d 435, 438 (1954). The court can perceive no reason why the Commission's decision as to the issue of the rates for DC power plant made in the Cost Docket should not be given preclusive effect.

McLeodUSA argues that it is not challenging the rates that were approved in the Cost Docket, but rather that it is challenging the manner in which DC power plant is measured. This argument ignores the fact that in the Cost Docket the Commission did not simply approve a numeric rate. Its approval of Qwest's rates for DC power plant included approval of charging CLECs for DC power plant on an "as ordered" basis. The court concludes that McLeodUSA is barred as a matter of law from contending in connection with the complaint before the Commission or in this court that Qwest's charges for DC power plant based upon cable orders, as provided in Exhibit A to the ICA, are unjust, unreasonable, or discriminatory.

That the foregoing should be so in these proceedings has a very practical aspect. Once Qwest accepts McLeodUSA's cable order, Qwest is committed to providing a power plant capable of producing the maximum amount of power that McLeodUSA's cabling might draw. No doubt McLeodUSA would be outraged if its collocated equipment required the full amount of power that it had ordered and Qwest was unable to provide that amount of power. Because Qwest has to provide power plant capacity to fill all of the CLEC orders that have been placed with it, there was a rational basis for the Commission to approve in the Cost Docket the billing of the DC power plant to CLECs on an "as ordered" basis.

 Qwest contends that McLeodUSA's challenge of Qwest's billing practices for power plant availability is barred by the filed rate doctrine, a concept that has the same effect as administrative *res judicata.* The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate ... regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). Under the doctrine, a filed rate approved by the governing regulatory agency "is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir.1994). The filed rate doctrine applies to interconnection agreements approved by a state agency under Section 252. *See Verizon Del., Inc. v. Covad Commc'ns Co.,* 377 F.3d 1081, 1089 (9th Cir.2004).

The rates contained in Exhibit A, subsection 8.1.4 of the ICA, to which McLeodUSA objects, were, as expressly found by the Commission, the result of a cost study that was submitted in the Cost Docket. As the Commission found, the rates in question were developed on an "as ordered" basis as to McLeodUSA,[53] with

**53.** *See* Decision No. 69872 at 24, ¶ 104, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

Qwest's costs at List 1 drain imputed to Qwest. Although the Commission correctly observed that the foregoing findings have little bearing on what Qwest and McLeodUSA intended the amended ICA to mean, the filed rate doctrine does mean that McLeodUSA cannot contend that the charges billed to it for DC power plant are discriminatory. Qwest is billing the rate that the Commission approved, and both the Commission and the court have found that the ICA as amended was not intended by the parties to change the charges for DC power plant.

Qwest also argues that even if McLeodUSA is correct that Qwest is impermissibly discriminating against it, McLeodUSA would not be entitled to the relief it seeks because the ICA is a "binding agreement" pursuant to Section 252(a)(1) of the 1996 Act. McLeodUSA has never contended that the ICA, including Exhibit A, was not binding upon it. McLeodUSA has not sought reformation of the ICA on the theory that it does not reflect the true agreement of the parties. McLeodUSA does in substance argue that it realized [54] only recently as a result of an internal audit that the billing arrangements embodied in Exhibit A to the ICA violated the nondiscrimination clause of the ICA.

Qwest's binding agreement argument is not persuasive, for it really does not meet McLeodUSA's contention that the ICA as amended contained a just, reasonable, and nondiscriminatory clause. Qwest is bound to honor that contract term. The Commission considered that requirement and correctly held that it was not violated. It is the Commission's approval of Exhibit A to the ICA in the Cost Docket, *res judicata,* and the filed rate doctrine which precludes McLeodUSA from challenging as discriminatory Qwest's billings for DC power plant. Only if McLeodUSA succeeded in convincing the Commission and the court that the parties intended by their amendment to the ICA to change DC power plant billing from an "as ordered" basis to a usage basis (and if the Commission had approved such modification) could McLeodUSA prevail on its challenge to Qwest's billing for DC power plant. Because McLeodUSA has failed to convince the court that the parties intended to change how DC power plant was billed, McLeodUSA's discrimination claim is precluded. However, for the sake of completeness, the court will continue its analysis of the Commission's findings on the discrimination claim.

The Commission found that "McLeod's evidence . . . is not sufficient to support a finding that Qwest's DC power charges are improperly discriminatory." [55] The Commission further found that "Qwest provided evidence that distinguishes its situation from that of a collocating CLEC and that would support and justify its billing practices." [56]

In briefing its contention that the foregoing findings are erroneous, McLeodUSA initially appeared to argue that the Section 251 nondiscrimination standard, which was incorporated into the ICA, is an absolute requirement. That argument fails. Neither the FCC nor any court has ever imposed an absolute or unqualified nondiscrimination standard with respect to inter-

54. Again, the rates and billing procedures that became Exhibit A to the ICA were considered by the Commission in the Cost Docket. McLeodUSA participated in the Cost Docket. It could not have failed to understand that Qwest's costs were viewed on an actual use basis, and that CLEC costs were considered on an "as ordered" basis for pur-

poses of constructing the rate for power plant availability.

55. Decision No. 69872 at 25, ¶ 107, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.

56. *Id.*

connect agreements. In its First Report and Order, the FCC states that the Section 251(c) standard is more stringent than the Section 202(a) standard; but the FCC has also stated that: "[w]e believe that Congress set forth a 'nondiscriminatory access' requirement in section 251(c)(3) rather th[an] an *absolute* equal-in-quality requirement[.]"[57] If, as McLeodUSA contends, and the court so concludes for purposes of this discussion,[58] the nondiscrimination standard is the same for all subsections of Section 251(c), then the Section 251(c)(6) standard cannot be absolute.[59]

As already discussed, the more stringent nondiscrimination standard contained in the 1996 Act required the Commission to focus upon the "terms and conditions an incumbent LEC imposes upon third parties as well as on itself."[60] This was a more stringent standard than that imposed under the 1934 Act because that standard only looked at the terms and conditions imposed on third parties. It did not consider the terms and conditions imposed on the ILEC itself. Thus the Commission was required to, and the court concludes that it did, make the requisite comparison between the terms and conditions which the ICA as amended imposed upon Qwest as compared to those imposed on McLeodUSA. The question then becomes: what might be considered an unjust, unreasonable, or discriminatory term or condition of an ICA?

McLeodUSA contends that the only exception to like treatment between ILECs and CLECs is technical infeasibility. Qwest does not disagree that permissible differences include technical infeasibility. Qwest contends, however, that there is at least one other permissible difference: differences in rates charged to CLECs because of differing costs. Indeed, the FCC has stated in discussing the more stringent standard of the 1996 Act "that cost-based differences in rates are permissible under sections 251 and 252."[61] The FCC explained:

> [S]ection 252(d)(1), for example, requires carriers to base interconnection and network element charges on costs. Where costs differ, rate differences that accurately reflect those differences are not discriminatory.... Strict application of the term "nondiscriminatory" as urged by those commenters who argue that prices must be uniform would itself be discriminatory according to the economic definition of price discrimination. If the 1996 Act is read to allow no price distinctions between companies that impose very different interconnection costs on LECs, competition for all competitors, including small companies, could be impaired. Thus, we find that price differences, such as volume and term discounts, when based upon legitimate variations in costs are permissible under the 1996 Act, if justified.[[62]]

---

**57.** *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, 15658, ¶ 313 (Aug. 8, 1996) (emphasis added).

**58.** The court's conclusion is based on a statement by the FCC in its First Report and Order that "the term 'nondiscriminatory' *as used throughout Section 251* applies to terms and conditions an incumbent LEC imposes on third parties as well as on itself." *Id.* at 15612, ¶ 218 (emphasis added).

**59.** *See also McLeodUSA Telecommc'ns Srvcs, Inc. v. Iowa Utilities Bd.*, 550 F.Supp.2d 1006, 1019 (S.D.Iowa 2008).

**60.** *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, 15617, ¶ 313 (Aug. 8, 1996).

**61.** *Id.* at 15928, ¶ 859.

**62.** *Id.* ¶ 860.

McLeodUSA does not disagree that cost differences are permissible under Section 251(c). The court concludes that the terms and conditions that an ILEC imposes on a CLEC must be equal to the terms and conditions that it imposes on itself unless it is technically infeasible to do so or if the differences are based on legitimate differences in costs.

As quoted above, the Commission found that Qwest does not impermissibly discriminate against McLeodUSA because of the fact that power plant costs are imputed to Qwest on one basis and are charged to McLeodUSA on a different cost-related basis; that is, costs are imputed to Qwest on the basis of List 1 drain, whereas costs are allocated to McLeodUSA on the basis of List 2 drain.[63] The Commission found, and there is substantial evidentiary support in the record for the finding, that this difference is permissible.

The record reflects that Qwest engineers its power plant to accommodate its own List 1 drain and the List 2 orders of CLECs. As the court has observed above, the reason for this distinction is to be found in the fact that Qwest knows what its own usage will be (List 1 drain); and it has to assume for purpose of plant construction that CLECs may call upon the plant to provide power to the CLECs on the basis of their orders for cabling (List 2 drain). In this regard, it is important to bear in mind that it takes time to assemble a power plant. Qwest cannot wait until a CLEC's power usage spikes in order to have plant available. The capacity to provide the power that CLECs have ordered has to be available to them. Once that plant is installed, the costs associated with

it are sunk. They do not vary with actual usage.[64] This evidence was not rebutted by McLeodUSA.

The reasonableness of Qwest's rates for DC power plant is also supported by FCC collocation rules. 47 C.F.R. § 51.323 sets forth the standards for physical collocation. Subparagraph (f) provides that an ILEC can provide physical collocation space on a "first come—first served" basis and that "[w]hen planning renovations of existing facilities or constructing or leasing new facilities, an incumbent LEC shall take into account *projected demand* for collocation of equipment[.]" 47 C.F.R. § 51.323(f) (emphasis supplied). While this rule appears to have more to do with building space than with power plant *per se*, the logic of this rule has equal application when, as here, the subject is power plant capacity.

McLeodUSA argues that Qwest cannot rely on the cost differences exception because the Commission did not rely on cost differences. Plainly, the Commission did focus upon costs that were imputed to Qwest itself on one basis, and costs that were allocated to McLeodUSA on a different basis. The court assumes, and there is no evidence to the contrary, that Qwest's plants cost some established amount of money which might be reduced to a plant-cost-per-amp basis. McLeodUSA has produced no evidence that the plant costs differ as between Qwest and McLeodUSA. What is different, and what McLeodUSA complains about, is the imputation of costs to Qwest on one basis and the allocation of costs to McLeodUSA on a different basis. While the Commission did not deal with

---

**63.** The Commission did not discuss technical feasibility and no party has demonstrated that there is any technical (engineering or hardware) aspect to the parties' disagreement about billing or power plant availabilities.

**64.** Qwest argues, and to a very limited degree, the reasonableness of Qwest's rates for DC power plant can be found in the record testimony showing that McLeodUSA itself allows collocaters in its facilities and charges for power plant on the basis of the CLECs' cabling orders.

the dollar amounts of costs, it did expressly deal with the differences that McLeodUSA contended were discriminatory.

Second, McLeodUSA contends that the FCC does not allow the type of cost differences that Qwest is alleging. In this regard, McLeodUSA contends that the FCC has disapproved price differences based upon the class of carrier. The portion of the FCC's First Report and Order upon which McLeodUSA relies emphasizes that "price differences based not on cost differences but on such considerations as competitive relationships, the technology used by the requesting carrier, the nature of the service the requesting carrier provides, or other factors not reflecting costs" is not permissible.[65]

The difference in treatment to which McLeodUSA points is not based upon any of the proscribed factors. What the record reflects and the Commission correctly found is that it was reasonable for an ILEC to charge different rates to a CLEC than it imputes to itself.[66] The evidentiary materials discussed above support that finding. Qwest has to assume that McLeodUSA may call upon it to provide up to the maximum power which can be drawn through the cabling ordered by McLeodUSA. Qwest's plant is engineered to provide that capacity, as well as the actual power needs of Qwest itself.

Finally, McLeodUSA contends that Qwest's cost study develops the DC power plant rate on the basis of DC power usage, not the size of the power feeder cables. McLeodUSA misrepresents the testimony in this regard. There are, of course, two rate elements found in Exhibit A to the ICA. The contention here is that the DC power plant element is discriminatory. This third argument made by McLeodUSA has to do with the derivation of the second rate element: development of a rate for the actual usage by CLECs of the power plant.

In sum, McLeodUSA's discrimination claim is barred by *res judicata* and the filed rate doctrine. Even if this claim were not barred, Qwest is not impermissibly discriminating against McLeodUSA in charging McLeodUSA for DC power plant on an "as ordered" basis.

### Conclusion

The findings of fact of the Commission are supported by substantial evidence and are not arbitrary and capricious. The opinion and order of the Commission is consistent with applicable law and is not contrary to law. The opinion and order of the Commission denying McLeodUSA's claim against Qwest for overcharges for DC power is affirmed.

The clerk of court shall enter judgment accordingly.

---

65. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* First Report and Order, 11 F.C.C.R. 15499, 15928, ¶ 861 (Aug. 8, 1996).

66. Decision No. 69872 at 25, ¶ 107, Appendix A, McLeodUSA's Opening Brief, Docket No. 63–2.